IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELDER CARE SERVICES, INC., <br> 2518 West Tennessee Street <br> Tallahassee, Florida 32304, | ) <br> ) <br> ) <br> ) | |
| Plaintiff | ) <br> ) | C.A. No. _____ |
| v. | ) <br> ) | |
| CORPORATION FOR NATIONAL AND <br> COMMUNITY SERVICE, <br> 250 E Street, S.W. <br> Washington, D.C. 20525, | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendant. | ) | |

## COMPLAINT

**Nature of Case.** Elder Care Services, Inc., has provided essential support services to the elderly in the Tallahassee area for nearly 50 years. In 2016, it delivered over 60,000 hot meals through its Meals on Wheels program; supported about 175 seniors with in-home support services; coordinated over 25,000 volunteer hours through the Foster Grandparents program and through its Elder Day Stay Program that provided help to over 115 people. It provides counseling, companionship, and care to North Florida like no other organization does.

The Corporation for National and Community Service has levied against ECS a fine of almost $400,000 for alleged violations regarding checks about the history of employees and volunteers. That fine is not based on any harm to CNCS or to any client of ECS. No money was misused or stolen. No one was hurt. No one was allowed to work with ECS clients who shouldn't have. All background checks were done. CNCS's process for levying the fine was arbitrary and capricious and the resulting fine threatens the existence and continued work of ECS.

## ALLEGATIONS COMMON TO ALL COUNTS

1.      Elder Care Services, Inc., (ECS) is a corporation organized and existing under the laws of the State of Florida. Its principal place of business is in Tallahassee. ECS is a nonprofit, community-based organization that provides meals, support, and services to elderly and needy residents in and around Leon County and the city of Tallahassee. It has been in operation since around 1970. It is a 501(c)(3) entity under the Internal Revenue Code.

2.      The Corporation for Community and National Service (CNCS) is a federal agency created in 1993 through the merger of two predecessor organizations—the Commission on National and Community Service and ACTION. CNCS serves as the government's domestic-volunteer organization and currently has three core programs: AmeriCorps, Senior Corps, and the Social Innovation Fund.

3.      This Court has subject-matter jurisdiction under 28 U.S.C. §1331 and venue is proper in the District of Columbia under 28 U.S.C. §1291(e)(1).

4.      On or about March 5, 2012, CNCS awarded to ECS a Senior Corps program grant referred to as grant number 12SRSFL005. The grant was in the total amount of $340,657 and covered a three-year performance period from April 1, 2012-March 31, 2015.

5.      On or about December 13, 2012, CNCS awarded to ECS two grants. One was known as grant number 13SCSFL002 and was in the total amount of $1,496,925. This grant was for the Senior Corps program known as the Senior Companion Program. The other grant was known as grant number 13SFSFL002 and was in the total amount of $1,022,064. This grant was for the Foster Grandparents Program. Both of these grants were for the three-year performance period from January 1, 2013-December 31, 2015.

6.      ECS performed all of the services for which these grants were awarded.

7. On October 5, 2012—that is, after the first of these three grants was awarded but before the second two grants were awarded—CNCS adopted a regulation regarding background checks for staff members and volunteers working with, in this case, seniors. By a final rulemaking published October 5, 2012, with an effective date of January 1, 2013, CNCS established new background-check procedures for both criminal-history checks and for sex-offender-registry checks. See 77 Fed. Reg. 194 (October 5, 2012), at 60922-60934. The new rules modified and expanded the rules which had been in place regarding running such checks.

8. Throughout 2013 and well into 2014, CNCS grantees like Elder Care Services, wrestled with how to apply the new check procedures. ECS had run checks for its volunteers and staff—as it had for many years—but it (and other grantees) had questions about the applicability of the procedures to certain staff positions as well as long-time employees who had been screened earlier. CNCS periodically sent out information sheets and other guides about how to apply the new procedures.

9. The procedures were so confused and the risk of grantee noncompliance was so great that CNCS held an assessment period running from October 14-December 5, 2014, to encourage grantees to review their files, to complete any checks that had been incomplete, and to correct noncompliance issues without penalty.

10. In February 2015, CNCS's Office of the Inspector General conducted an onsite evaluation of ECS's files regarding issues raised by a disgruntled former employee who had been terminated by ECS for submitting fraudulent forms to ECS's CEO. Her actions and her termination were also known to CNCS. Although this employee had been the director of ECS's Senior Volunteer Program, her allegations did not concern the background-checks issue. Nevertheless, while CNCS was looking into the employee's allegations, they also reviewed the

files concerning the National Service Criminal History Check requirements. During that February review, a number of ECS files were alleged to be delinquent because the sex-offender-registry check (run through the Department of Justice's National Sex Offender Public Website) had not been completed on a nationwide basis. While CNCS inspectors were still onsite, these checks were rerun and all were completed and were found to be clear.

11. Throughout this time, and throughout all of the checks and reviews discussed in this complaint, there were no ECS employees, staff members, or volunteers who failed the background checks or who dealt with any ECS clients when they should not have been in that position. In CNCS parlance, at no time did ECS employ or use any "ineligible" individuals, regardless of the issue of whether their files were "noncompliant."

12. On June 10, 2015, the CNCS Inspector General issued a report regarding the February 2015 onsite review. The report said that ECS had not complied with 45 CFR §2540.203(b) in running checks because most checks were done on a local or statewide basis only, not nationwide. CNCS noted that there had been a "clerical problem" was running of the sex-offender-registry searches. (The DOJ website had an "advanced search" feature which allowed inputting of known information about the subject's address or zip code. Ironically, this "advanced" feature resulted in less information being provided in the response because it limited the scope of the response to the area near the current address or zip code.)

13. The Inspector General recommended, and CNCS concurred, that there should be a "disallowance" of costs in the total amount of $29,500 for the three grants at issue here. That figure was derived by penalizing ECS $7000 for 7 background checks on staff, and $22,500 for 21 background checks on volunteers. (March 16, 2016 CNCS response letter.)

14. In the middle of this process that resulted in a penalty of $29,500, there were several other relevant developments. First, CNCS conducted another review of files, including files for personnel that had been staff or volunteers for many years as well as of people who no longer worked with ECS. Second, CNCS was developing a "matrix" of penalties (labeled as "disallowances" for noncompliance with criminal-history and sex-offender-registry checks) with CNCS applying fixed per-violation fines depending upon the agency's determination of the level of mitigation exhibited by the grantee. Although the National Criminal History Check Interim Disallowance Guide, NSCHC Risk-Based Disallowance Matrix was announced in August 2015, it was not made final until early 2017.

15. Eventually, CNCS brought forth a new compilation of alleged violations by ECS and a matrix-derived fine of $400,000 (later reduced to $396,000). The claimed debt of $400,000 comprises claims for (a) $19,500 for alleged noncompliance for staff associated with all three grants; (b) $160,500 for volunteers or staff associated with the Senior Companions program (Grant 13SCSFL002); (c) $220,000 for people associated with the Foster Grandparents program (13SFSFL002).

16. For the Foster Grandparents program grant, the fines assessed for noncompliance were:

- 112 files with claimed low mitigation @$1500 apiece
- 32 files with claimed moderate mitigation @1000 apiece
- 40 files with claimed substantial mitigation @500 apiece

But of these files, 21 listed individuals were not working with ECS as of October 2014 (when the Assessment Process was being undertaken). And of the 112 files marked with low mitigation in connection with the Foster Grandparents Program, 10 people began service at some point during

2015; 9 began service at some point during 2014, and 5 began service at some point in 2013. The remaining 88 people started in 2012 or earlier, including as noted, people who were no longer serving at ECS in October 2014. That means that 78.5% of the people whose files were tagged with "low mitigation" had been associated with this program for over 3 years—and in many cases over 10 or 15 years—when their files were tagged as noncompliant and with low mitigation. That $132,000 in assessed disallowance for people who had been associated for a long time with this program and for whom, again, there was no issue about their histories or conduct. And on virtually all of those files, the complaint was a "late" sex-offender-registry check; on almost all of those people, one or more other checks had been done on a statewide and nationwide basis and with an FBI fingerprint check. Of course a "late" NSOPW check from 3, 5, or 10 years ago can never be fixed. Once it's late, it's late forever.

17. The Foster Grandparent program files that were tagged as "moderate" mitigation show a similar pattern. Of the 32 such files, 8 people (25%) had started since January 1, 2013, with 75% of the people having started earlier. On many of the files, moreover, a fingerprint-based state and national criminal-history check had been done on time. The more recent starts in the FGP program dominated in the "substantial mitigation" findings. Over half of the 40 files tagged as involving substantial mitigation were of people who had started since 2013. Many of such files had multiple on-time checks completed yet still wound up in the violations category.

18. The CNCS 'matrix" itself sets two fines for a single violation. If CNCS compiles enough violations within a single review, the fine doubles. Thus, for the same violation, the fine can be $500, but if CNCS concludes that more than half of the files it reviews were noncompliant in one way or another, the fine doubles to $1000. Therefore, while CNCS labels its matrix as a "risk-based disallowance matrix," its system of fines is not "risk-based." Rather, it is

driven by both a numbers game (how many files did CNCS review?) and an assessment of "risk" that takes no account of any actual risk to either the grant, the programs, or the clients being served.

19. The same pattern is demonstrated in the files concerning the Senior Companions grant. Again, 25 of the listed names were not working with ECS as of October 1, 2014, when the Assessment Process was being conducted. Again, the bulk of the fine is about late reports on veteran volunteer files. Newer files were substantially better in terms of compliance. On the staff side too, there were only 12 reports of files with problems labeled as "substantial mitigation" and 12 total in the other two categories.

20. While CNCS refers to the assessment of $400,000 (now $396,000) as a "disallowance" of costs, the reality is that what CNCS has levied is a fine or penalty unrelated to the terms of the relevant grants or the funding of those grants. CNCS is not seeking payment of funds from ECS against which certain costs could be treated as "disallowed." To the contrary, ECS's grants are structured so that ECS fronts or advances the funds necessary to provide services to the client community, for which ECS then is reimbursed by the terms of the grant. There is no pot of money or pending accounting against which costs can be disallowed.

21. Moreover, CNCS's own guidance about the consequences of noncompliance with the requirements regarding checks does not envision the kind of penalty it has imposed on Elder Care Services. For example, in CNCS's guidance, couched as frequently asked questions, (December 11, 2014), the Corporation said: "In addition to incurring potential liability, CNCS grantees who do not comply with the requirements risk loss of CNCS funding and disallowed costs attributable to the people on whom checks were not performed." Yet the penalty imposed here does not fall into either category.

22. Elder Care Services has challenged CNCS's imposition of the penalty. Its appeal and request for reconsideration was denied and ECS has now exhausted its administrative remedies without relief. CNCS has demanded payment of the $396,000 plus interest and related costs.

23. Elder Care Services cannot pay the imposed fine. It lacks the resources to pay the amount and CNCS is well-aware of that fact.

## COUNT I
**(Judicial review of arbitrary and capricious agency action and sanction)**

24. The allegations of Paragraphs 1-23 are incorporated by reference in this count.

25. Within the meaning of 5 U.S.C. § 702, Elder Care Services is a person suffering legal wrong and is adversely affected by the action of CNCS in connection with its determination of "disallowed costs" (fines).

26. Within the meaning of 5 U.S.C. § 704, CNCS has issued its final agency action in connection with these amounts. There is no other available agency review nor any statutorily required review beyond what has already been conducted by CNCS.

27. CNCS's actions in determining that there are $396,000 in "disallowed costs" associated with the background checks is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. CNCS used an arbitrary "matrix" of fines to impose a penalty that was not called for by the agency's regulations and was imposed for conduct that did not violate clearly defined requirements of the grants. The agency's analysis of the relevant files did not account for the timely background checks that were in fact conducted by CNCS. The analysis also did not address the reality that no ineligible individuals were ever employed, no one was harmed, no money was misapplied or stolen, and that, at most, immaterial clerical errors were conducted.

28. CNCS's actions were also arbitrary and capricious because they were motivated not by law or by perceived potential injury to the programs or individuals or to the grant money, but because of political and public pressure from the Inspector General's office and other sources. CNCS sought out violations and then piled on results from inactive files of former employees in order to drive an outcome of a large, unpayable fine against ECS.

29. CNCS's decision here also violated ECS's due-process rights and should be vacated pursuant to 5 U.S.C. § 706 because the fines were assessed without an opportunity for a hearing and the initial fine was increased arbitrarily and without a hearing. Also, CNCS's process for review of its determination also denied ECS an effective review, because the reviewing official was the same person or office that assessed the fine in the first instance and in response to the pressure of the Inspector General and other sources.

30. ECS has already been harmed by the determination of CNCS, including by having to disclose it in its audit. If CNCS seeks to enforce payment of the obligation, that action will likely force ECS to shutter its doors, causing a huge hole in the social-support services in Tallahassee. This will harm many seniors and other needy residents who count on ECS.

WHEREFORE, ECS asks that this Court hold unlawful and set aside CNCS's determination and vacate the sanction imposed by CNCS. ECS also asks for such other and further relief as the Court deems appropriate, including an order staying efforts by CNCS or the United States to collect any portion of the fine.

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)
Paul.Kiernan@hklaw.com (email)

Attorneys for Elder Care Services, Inc.

#52155217_v2