UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| ELDER CARE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1634 (RMC) |
| | ) | |
| CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

The Corporation for National and Community Service (CNCS) alleges regulatory noncompliance by its grantee Elder Care Services, Inc. with CNCS regulations requiring timely background checks for all Elder Care volunteers and employees. CNCS has levied a $400,000 cost disallowance, which Elder Care considers a fine. Elder Care argues that its noncompliance should not result in the cost disallowance imposed, because CNCS acted arbitrarily and capriciously in imposing the disallowance and because various issues should excuse the noncompliance.

### I. BACKGROUND

Plaintiff Elder Care is a non-profit organization providing support services to the elderly in the Tallahassee, Florida area. Defendant CNCS is a federal government agency that promotes volunteering, service, and civic engagement. Elder Care receives a significant amount of grant money from CNCS to fund its work in the community. At issue in this case are three grants awarded in 2012 (total value $2,859,646): one grant awarded on or about March 5, 2012 for a three-year performance period beginning April 1, 2012, and two grants awarded on or about

1

December 13, 2012 for a three-year performance period beginning January 1, 2013. Compl. [Dkt. 1] ¶¶ 4-5.

On October 5, 2012, after the award of the first grant but before the award of the second and third, CNCS adopted a regulation modifying, as relevant, the requirements for background checks of grantee staff members and volunteers working with seniors. *Id*. ¶ 3; *see also* 77 Fed. Reg. 60922 (codified at 45 C.F.R. § 2540.200 *et seq.*). The 2012 regulation established new procedures regarding criminal history and sex-offender registry status checks; it became effective on January 1, 2013. Compl. ¶ 7. Grantee Elder Care, and most of the grantee population, had questions about the new procedures and CNCS periodically distributed information and guidance regarding implementation of the 2012 regulation. *Id*. ¶ 8. Evidently this period of change and the related confusion among grantees prompted CNCS to open an "assessment period" in late 2014—essentially a period of amnesty during which grantees could review their files, complete background checks that were incomplete, and correct noncompliance issues without penalty. *Id*. ¶ 9.

In February 2015, the CNCS Office of the Inspector General (OIG) opened an investigation into Elder Care's performance under the Senior Volunteer Program, one of the programs covered by a CNCS grant, based on issues raised by a disgruntled former employee. *Id*. ¶ 10. In June 2015, the CNCS OIG issued its report, finding that Elder Care had not complied with § 2540.203(b) in running background checks on affiliated individuals because most of the checks it performed were limited to local or statewide data but not national information. *Id*. ¶ 12. The OIG report recommended that CNCS disallow Elder Care costs in the amount of $29,500 for the three grants at issue here. *Id*.

In August 2015, CNCS released its National Service Criminal History Check Interim Disallowance Guide (NSCHC Guide or Guide) to notify grantees of how CNCS would enforce compliance with the 2012 regulation. *Id.* ¶ 14. The Guide included a Risk-Based Disallowance Matrix (Matrix) that set fixed, per-violation fines based on an uncleared individual's access to vulnerable populations and the level of CNCS-determined mitigation exhibited by the grantee in performing background checks or some portion thereof. *Id.*; *see also* Ex. 2, Def.'s Mot. to Dismiss (MTD) [Dkt. 13], National Service History Check Interim Disallowance Guide [Dkt. 13-2] at 4.[1]

Sometime after the OIG report was released, CNCS conducted another, broader compliance review of Elder Care files, including files for individuals who had been staff or volunteers for many years as well as for individuals who no longer worked for Elder Care.[2] *Compl.* ¶ 14. This broader review resulted in the assessment of a Matrix-devised cost disallowance of $400,000: $19,500 for noncompliance for staff associated with all three grants; $160,500 for volunteers or staff associated with the Senior Companions program; and $220,000 for people associated with the Foster Grandparents program. *Id.* ¶ 15.

---

[1] Plaintiff argues that the Court may not consider the Matrix in the context of a motion to dismiss because it was not attached to the Complaint. However, Plaintiff references the Matrix throughout the Complaint and the Court deems it incorporated by reference and subject to consideration on a motion to dismiss. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). The Court has reviewed and considered Exs. 1-5 to the Motion to Dismiss and finds that all five exhibits are incorporated by reference based on the allegations set forth in Plaintiff's Complaint. *See* Ex. 1, MTD, Guidance and Instructions [Dkt. 13-1]; Ex. 2, MTD, Matrix [Dkt. 13-2]; Ex. 3, MTD, 9/7/16 Debt Collection Letter [Dkt. 13-3]; Ex. 4, MTD, Response to Request for Review Letter (Review Letter) [Dkt. 13-4]; Ex. 5, MTD, CNCS Response to OIG Investigation of Elder Care [Dkt. 13-5].

[2] It is unclear from the Complaint precisely when CNCS undertook the broader Elder Care compliance review in relation to the periodic clarifications that CNCS is alleged to have issued, although the Court understands that all occurred after the "assessment period" had concluded. *See* Compl. ¶¶ 9-10, 12, 15.

Elder Care appealed the Matrix-based cost disallowances to CNCS; the agency reduced the amount from $400,000 to $396,000 and denied the further request for reconsideration. On August 14, 2017, Elder Care filed its complaint in this Court, alleging that CNCS acted arbitrarily and capriciously and deprived Elder Care of due process in imposing the cost disallowance. CNCS moves to dismiss for failure to state a claim under Rule 12(b)(6). *See* MTD; *see also* Fed. R. Civ. P. 12(b)(6).

The Court has jurisdiction under 28 U.S.C. § 1331. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Though the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*, does not provide an independent basis for subject matter jurisdiction, *see Califano v. Sanders*, 430 U.S. 99, 107 (1977), final agency action is subject to judicial review when there is no other adequate remedy. 5 U.S.C. § 704. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 663 (D.C. Cir. 1975) (citing 5 U.S.C. § 704). Venue is proper in the United States District Court for the District of Columbia because Defendant CNCS is headquartered in the District. *See* 28 U.S.C. § 1391(e)(1).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the

4

elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Oberwetter v. Hilliard*, 639 F.3d 545, 549 (D.C. Cir. 2011). But, a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *See Abhe & Svoboda*, 508 F.3d at 1059.

### III. ANALYSIS

The first issue to consider is the government's authority to "demand[] repayment" if the recipient of a federal grant violates the grant's requirements, in part, but shows no bad faith. The Supreme Court long ago answered this question in the affirmative, although that answer is not without certain limitations. *See Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 658 (1985). *Bennett* involved grants under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 *et seq.*, which were used by Kentucky to supplant, not merely supplement, local costs, contrary to the terms of the Title I grants. The Supreme Court disagreed with the Sixth Circuit Court of Appeals that Kentucky's "substantial compliance with legal

5

requirements affect[ed] liability." *Bennett*, 470 U.S. at 663. "Nor" did it think "that the absence of bad faith absolve[d] the State from liability if funds were in fact spent contrary to the terms of the grant agreement." *Id.* at 664. Finally, where there was no ambiguity with respect to limitations on use of the grant monies, the government is not limited to recovering "misused federal funds only if every improper expenditure has been specifically identified and proscribed in advance." *Id.* at 666 (emphasis omitted).

The Title I school grants at issue in *Bennett* began after "Congress in 1965 articulated the general goals of Title I," but failed to "precisely outline the permissible means for implementing those goals," which resulted in considerable uncertainty among grantees. *Id.* at 667. After some years, Congress amended the statute in 1978 and "directed the [Office of Education] to prepare a policy manual compiling the applicable statutes, regulations, advisory opinions, and other materials . . . to 'ensure that federal officials uniformly interpret, apply, and enforce Title I requirements throughout the country.'" *Id.* at 668-69.[3]

Within this evolving enforcement scheme, the Court refused to find that the States "guaranteed that their performance under the grant agreements would satisfy whatever interpretation of the terms might later be adopted by the Secretary [of Education]." *Id.* at 670. To the contrary, Kentucky "agreed to comply with, and its liability is determined by, the legal requirements in place when the grants were made. Consequently, in evaluating past expenditures, the Secretary's interpretation of the requirements of Title I should be informed by the statutory provisions, regulations, and other guidelines provided by the Department at that time." *Id.*

---

[3] "The Office of Education was the predecessor to the present Department of Education and was responsible for the administration of Title I until 1980." *Bennett*, 470 U.S. at 674 n.1 (citing *Bell v. New Jersey*, 461 U.S. 773, 776 n.1 (1983)).

While the parties spend significant space on *Bennett* in briefing, both appear to have missed the most salient issues in its application to the case at hand. The 2012 regulation became effective January 1, 2013; at that time, all three relevant grants had already been awarded to Elder Care. The parties do not address the implications of the fact that the regulation and related enforcement scheme evolved *after* the relevant grants were awarded, or explain the prior regulatory regime and its potential bearing on CNCS's assessment of the cost disallowance. Further information is required to determine the impact of *Bennett* on the cost disallowance at issue here.

## IV. CONCLUSION

For the aforementioned reasons, the Court will deny CNCS's Motion to Dismiss, Dkt. 13, without prejudice. The Court will also direct the parties to meet and confer and propose a schedule for briefing consistent with this Court's Memorandum Opinion.

Date: September 28, 2018

_____
ROSEMARY M. COLLYER
United States District Judge